(C. D. 1185)

STEINWAY & SONS *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 29, 1949)

*Strauss & Hedges* (*Joseph Schwartz* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Joseph E. Weil* and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

OLIVER, Chief Judge: The merchandise involved in this case consists of ivory strips or tablets used to make piano key tops, i. e., the playing surface of the white piano keys. They were classified as "parts of musical instruments" under paragraph 1541 (a) of the Tariff Act of 1930, providing as follows:

PAR. 1541. (a) Musical instruments and parts thereof, not specially provided for, pianoforte or player-piano actions and parts thereof, violin bow hair, pitch pipes, tuning forks, tuning hammers, and metronomes, all the foregoing, 40 per centum ad valorem.

They are claimed dutiable at 35 per centum ad valorem under paragraph 1538, Tariff Act of 1930, as manufactures of ivory.

Two strips of ivory, representative of the merchandise in question, were received in evidence as plaintiff's collective exhibit 1 (R. 2).

The only witness was the head of the engineering research department of the plaintiff firm who stated that he had personal knowledge as to the manner in which his company manufactures pianos and specifically as to the use of the ivory strips in question. His testimony may be summarized as follows:

The imported pieces of ivory are purchased in sets, each set being sufficient to cover the keys of one piano. After importation, the set is matched for color and for grain, each of the 88 tablets being assigned a different number from 1 to 88 for that purpose. There are two

kinds of tablets in the importation. Both are rectangular in shape. The broader but shorter size is called the "head" of the key. The longer or narrower piece is called the "tail." The matching is for even gradation in color and size of the finished keyboard. After matching, the set of ivories is then dried in a dry kiln to bring the moisture content down and to shrink it before gluing. Next "it is jointed," that is, one narrow edge of the tail and one short edge of the head are milled to make a joint "because these two edges are abutted against each other on the finished keyboard" (R. 5). The ivory tablets are then glued to the keyboard in their relative positions as they will be on the finished piano. Before being glued, the ivories are "tooth-planed" or roughened on the under side to create a groove so that they will adhere to a muslin cloth which is glued to the top of the keyboard. It appears that ivory is difficult to glue and in order to make a good joint a muslin underlay is used. The "keyboard is one board of wood glued up with separate pieces" and the ivories are glued to the upper surface of the board. The "heads" (the shorter but broader pieces, measuring approximately $1''$ x $2\frac{1}{16}''$) cover the front of the playing surface of the keys and there are "roughly 55 of them," there being 55 whole tones or naturals on the piano and on the scale (R. 6). The "tails" (the narrower pieces which go from the head of the key back towards the piano) measure about $\frac{9}{16}''$ x $4''$ because it is necessary to leave a cut-out where the black keys are fitted. After the ivory pieces are glued to the keyboard, the ivory is planed and scraped by hand to smooth it. Next, the keys are cut out of the keyboard in two sawing operations, one by a circular saw which cuts in front and the other by a band saw which cuts in from the rear. The two joints meet and the keys are broken out of the keyboard, thus producing the 88 separate keys. They are then run by hand through a machine which rounds the edges of the ivory on the front (head) pieces only. The keys are then individually buffed by hand, which completes the manufacture. It appears that aside from the operations of scouring for ease in gluing, the matching and joining of them before they are glued, and the scraping, these imported blanks are ready for use for the purpose of making the piano keys (R. 9). In each set there are either just enough keys for one piano or one or two extra. On cross-examination the witness stated that merchandise similar to the merchandise imported had never been used in significant quantities for any other purpose than that described and that while some of the pieces were made into paper cutters as souvenirs, the amount was less than one-half of 1 per centum and the chief use of such articles was on pianos.

Plaintiff in its brief contends that the pieces of ivory in question are not, in their imported condition, parts of musical instruments but are

merely materials for use in manufacturing parts, to wit, piano keys. The defendant, on the other hand, maintains that the articles at bar are dutiable as "parts" of musical instruments, as classified.

In support of its contention that the pieces of ivory in question are merely materials for use in manufacturing parts (piano keys) and as such properly dutiable as manufactures of ivory, the plaintiff in its brief cites *Robertson* v. *Gerdan*, 132 U. S. 454, 33 L. ed. 403, decided in 1889. The merchandise there consisted of pieces of ivory for the keys of pianos and organs, matched to certain octaves, sold to manufacturers who scraped them to make them adhere to wood and then glued them to wood. The issue in that case was whether the ivory pieces were dutiable as musical instruments or as manufactures of ivory. The Supreme Court there said:

> * * * That the articles were in themselves musical instruments, cannot be gravely contended. They were ivory pieces for the keys of pianos or organs. As imported, they were simply pieces of ivory, which had undergone a process of manufacture; were of a shape and size to be used for certain octaves of pianos and organs; and were sold to piano makers and key-board makers. Those persons scraped the lower surface of the ivory, to make it adhere to a piece of wood to which it was afterwards glued. In the shape in which the articles were imported, they were clearly manufactures of ivory.

However, the tariff acts under which the articles in the *Robertson* case, *supra*, were imported did not have any provision for "parts of" musical instruments and the Court therein said, at page 457:

> Neither of the statutes in question imposes on parts of musical instruments the same rate of duty which it imposes on musical instruments.

In reviewing legislation affecting the involved articles, the Court further stated, page 458:

> * * * so, in the Revised Statutes of 1874, and as enacted in 1883, while there is no specific duty on parts of musical instruments, as such parts, "catgut strings or gut-cord, for musical instruments", are made free of duty, leaving other parts of musical instruments to be dutiable under other provisions than that applicable to "musical instruments of all kinds."

The Supreme Court in the *Robertson* case, *supra*, further stated:

> If Congress had intended, in either enactment of the Revised Statutes, to impose the same duty on parts of musical instruments which it imposed on musical instruments, it would have been easy to impose that duty on "musical instruments of all kinds, and parts of the same."

Subsequent to this declaration of the Court and in the Tariff Act of 1894, there was substituted for the language "musical instruments of all kinds" the words "musical instruments or parts thereof." In *United States* v. *Lyon & Healy,* 4 Ct. Cust. Appls. 438, T. D. 33873, the court stated that the words "musical instruments or parts thereof" were included in the Tariff Act of 1894 and in subsequent tariff acts

to meet the decision of the Supreme Court of the United States in *Robertson* v. *Gerdan, supra,* and pointed out that the words were in language almost identical with that suggested by the Supreme Court as sufficient to include the piano keys therein involved. The court in the *Lyon* case, *supra,* further stated with respect to the pieces of ivory involved in the *Robertson* case, *supra,* that "* * * it is equally significant * * * that the Supreme Court regarded those articles as parts of musical instruments."

The case of *Atlas Shipping Co.* v. *United States,* 41 Treas. Dec. 473, T. D. 39179, also cited by plaintiff, is likewise not in point. The issue there was whether strips of ivory, used chiefly in the manufacture of piano keys, were dutiable as manufactures of ivory, not specially provided for, rather than as "ivory tusks" or manufactured articles under the act of 1913. The court held they were dutiable as manufactures of ivory, which, in fact, they were, but there, too, the claim that the articles were parts of musical instruments was not in issue.

Where a material has been so advanced in manufacture as to have reached a stage in which it is clearly incapable of being made into more than one article, then it shall be deemed, even though unfinished, to have been so dedicated to a single use as to fix its status as a part of that article (*United States* v. *Schenkers, Inc.,* 17 C. C. P. A. 231, at page 233, T. D. 43669). The pieces of ivory at bar have been manufactured to such an extent that they are, in their imported condition, dedicated or committed to use as piano keys alone and have assumed a character and form of the part for which they were designed. They are, therefore, parts of musical instruments as well as manufactures of ivory and the former is the more specific designation.

In *United States* v. *Lyon & Healy, supra,* at page 441, the court stated:

The phrase "parts of musical instruments," as applied to merchandise of more or less definite construction, makes it dutiable according to use. If the merchandise is to be used in the make-up of musical instruments, becoming a part thereof, they are dutiable under this provision; otherwise not. * * *

And, further, at page 442:

Applying these principles to the record and samples before us, and as heretofore described, it would seem that as to the violin and cello necks they should be properly classifiable as parts of musical instruments. Their physical construction is such as to plainly render them unserviceable for any other purpose and to clearly identify them and their future use as parts of musical instruments.

The testimony in the case at bar indicates that these strips of ivory were intended to be and were actually used in the making of piano keys and were dedicated solely to that use. "They come in sets for that purpose" (R. 9). There is nothing in this record to indicate that they were used in the making of other articles except

that plaintiff's witness testified that his company "made souvenirs and things like that out of them, but never for any commercial purpose" (R. 11) and the principal or chief use was on pianos. Chief use is the test for "parts" (*Magone* v. *Wiederer*, 159 U. S. 555).

The articles before us are actually unfinished ivory piano keyboard covers or parts which have been cut to the desired dimensions in which they are ultimately used and the size is not materially changed in the manufacturing process. The polishing, planing, and rounding of the edges of the front pieces, and the joining of the front and tail pieces, which is one of the manufacturing operations, are simply finishing operations. We are of opinion that the plaintiff has not overcome the presumption of correctness attaching to the collector's classification and has not affirmatively established that the articles at bar are chiefly used for any other purpose than for parts of pianos. The protest is overruled and judgment will be entered accordingly.